IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **CHERYL DOUGHERTY, individually,** | § | |
| **and on behalf of all others similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 2:09-443** |
| | § | |
| **RAMONA CERRA,** *et al.* | § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THIRD AMENDED COMPLAINT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Daniel McNeel Lane, Jr.
(*admitted pro hac vice*)
Brian S. Jones
(*admitted pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
300 Convent Street, Suite 1600
San Antonio, Texas 78205
(210) 281-7000

-and-

Thomas J. Hurney, Jr., Esquire
WV Bar ID# 1833
Michael M. Fisher, Esquire
WV Bar ID# 4353
JACKSON KELLY PLLC
P.O. Box 553
Charleston, West Virginia 25322
(304) 340-1000

**Attorneys for Defendants Ramona Cerra, John Cook, Greg Garrett, George Edwards, Clarence Burdette, Roland Rich, Luther Cope, The Variable Annuity Life Insurance Company, AIG Retirement Advisors, Inc. (n/k/a VALIC Financial Advisors, Inc.), and AIG Retirement Services Company (n/k/a VALIC Retirement Services Company)**

## TABLE OF CONTENTS

Preliminary Statement .......................................................................................................1

Factual Background ...........................................................................................................3

West Virginia's State Retirement System's Trouble ........................................................3

The Legislature Comes to the Rescue................................................................................4

Cheryl Dougherty Enrolls in the DCP ..............................................................................7

Dougherty's Investment in the Annuity and Transfer to Another DCP Investment.........8

Press Reports Question Whether Switching to DCP was a Mistake..................................9

Subsequent Legislation Regarding the Merger of Two Retirement Systems ....................9

Dougherty Brings Suit .....................................................................................................10

Arguments   ......................................................................................................................11

    I.     Dougherty's Claims Should Be Dismissed Under Rule 12(b)(6) ..........................11

        A.     Standard of Review. .......................................................................11

        B.     SLUSA Mandates Dismissal of this Suit. .....................................12

              1.     Dougherty's Suit is a Covered Class Action. ...................13

              2.     Dougherty Alleges Misrepresentations of Material Facts.............14

              3.     Defendants' Alleged Misrepresentations Coincide With the Purchase or Sale of a Covered Security. .........................................15

        C.     Dougherty's Fraud and Misrepresentation Are Barred by the Statute of Limitations.............................................................................19

              1.     The Two-Year Statute of Limitations Applies to Dougherty's Fraud and Negligent Misrepresentation Claims. ..............................................................................19

              2.     Dougherty's Claims Cannot Be Saved by the Discovery Rule. ..................................................................................19

        D.     Dougherty's Fraud Claims Regarding Performance and Failure to Disclose Fail as a Matter of Law.................................................................21

1.     Representations Regarding Any Future Performance of Investments Are Not Actionable as Fraud. ....................................21

2.     To the Extent Dougherty's Fraud Claim Hinges Upon a Duty to Disclose, it Cannot Survive Because VALIC Owed Her No Duty. ....................................................................22

3.     Dougherty's Claim that VALIC Failed to Advise Her of Surrender Charges Have No Merit...................................23

E.     Dougherty's Claims of Conspiracy, Joint Venture and Unconscionability Also Fail........................................24

1.     Dougherty's Conspiracy Claim Cannot Stand Because Defendants Cannot Conspire with Each Other or their Agents. .........................................................24

2.     Joint Venture, Civil Conspiracy, and Unconscionability Are Not Independent Causes of Action. .............................25

    a)     Civil conspiracy and joint-venture do not stand on their own. ...................................................25

    b)     Unconscionability is a defense to an action for breach of contract, not an independent cause of action.........................................................25

II.     VALIC is Entitled to Summary Judgment on Plaintiffs' Claims ...........................26

A.     Standard of Review. .................................................26

B.     The Summary Judgment Evidence Demonstrates that Dougherty Should have Discovered the Alleged Fraud at Least five years before the Filing of This Suit. ...................................26

Conclusion ............................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
  910 F.2d 139, 146 (4th Cir. 1990) ..................................................................24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 251-52 (1986) ..........................................................................26

*Armor v. Lantz*,
  535 S.E.2d 737, 742-3 (W.Va. 2000) .............................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 555, 570 (2007) ........................................................................12

*Brown v. Ivie*,
  661 F.2d 62, 65 (5th Cir. Unit B. Nov. 1981) .................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 322-23 (1986) ..........................................................................26

*Cook v. Heck's Inc.*,
  342 S.E.2d 453, 460 (W. Va. 1986) ................................................................24

*Dixon v. Am. Indus. Leasing Co.*,
  253 S.E.2d 150, 152 (W. Va. 1979) ................................................................25

*Dorsey v. Chesapeake & Ohio Ry. Co.*,
  476 F.2d 243, 245-6 (4th Cir. 1973) ...............................................................24

*Gaither v. City Hosp., Inc.*,
  487 S.E.2d 901, 909 (W.Va. 1997) .............................................................20, 27

*Gray v. Marshall County Bd. of Educ.*,
  367 S.E.2d 751, 755 (W. Va. 1988) ................................................................24

*Gray v. Seaboard Sec., Inc.*,
  126 Fed. Appx. 14, 16 (2d. Cir. 2005) ............................................................16

*Horton v. Tyree*,
  139 S.E. 737, 738 (W. Va. 1927) ....................................................................21

*In re Mut. Funds Inv. Litig.*,
  309 Fed. Appx. 722, 725 (4th Cir. 2009) ........................................................13

*In re Mut. Funds Inv. Litig.,*
    384 F. Supp. 2d 845, 871 (D. Md. 2005) .......................................................................13

*In re Mut. Funds Inv. Litig.,*
    437 F. Supp. 2d 439, 443 (D. Md. 2006) ................................................................14, 15

*Janssen v. Carolina Lumber Co.,*
    73 S.E.2d 12 (W. Va. 1952) ......................................................................................22

*Kurz v. Fid. Mgmt. & Research Co.,*
    No. 07-CV-709-JPG, 2008 WL 2397582, at *4 (S.D. Ill. June 10, 2008).........................18, 19

*Lander v. Hartford Life & Annuity Ins. Co.,*
    251 F.3d 101, 109 (2d Cir. 2001)...................................................................................14

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.,*
    318 F.3d 148, 155 (2d Cir. 2003)...................................................................................28

*Livingston v. K-Mart Corp.,*
    32 F. Supp. 2d 369, 374 (S.D. W. Va. 1998) ..................................................................22

*Lowinger v. Johnston,*
    No. 3:05CV316-H, 2005 WL 2592229, at *3 (W.D.N.C. Oct. 13, 2005) ...............................12

*McKinney v. Bd. of Trs. of Maryland Cmty. Coll.,*
    955 F.2d 924, 928 (4th Cir. 1992) .................................................................................26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coe,*
    313 F. Supp. 2d 603, 609 (S.D. W. Va. 2004) .................................................................24

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
    547 U.S. 71, 78-83 (2006) ................................................................................... passim

*Oksanen v. Page Mem'l Hosp.,*
    945 F.2d 696, 703 (4th Cir. 1991) .................................................................................24

*Pocahontas Mining Co. L.P. v. OXY USA, Inc.,*
    503 S.E.2d 258, 264 (W. Va. 1998) (Workman, J., concurring) ...........................................23

*Poth v. Russey,*
    99 Fed. Appx. 446, 456 (4th Cir. 2004)...........................................................................22

*Potter v. Janus Inv. Fund,*
    483 F. Supp. 2d 692, 696 (S.D. Ill. 2007).........................................................................13

*Reddy v. Cmty Health Found. of Man,*
    298 S.E.2d 906, 910 (1982) .........................................................................................24

*Robinson v. Am. Honda Motor Co., Inc.,*
   551 F.3d 218, 222 (4th Cir. 2009) ...................................................................11

*Rowinski v. Salomon Smith Barney, Inc.,*
   398 F.3d 294, 300 (3d Cir. 2005).......................................................14, 19

*Schatz v. Rosenberg,*
   943 F.2d 485, 489 (4th Cir. 1991) ...................................................................11

*SEC v. Lauer,*
   864 F. Supp. 784, 793 (N. D. Ill. 1994), *aff'd*, 52 F.3d 667 (7th Cir. 1995) ...........................19

*SEC v. Zandford,*
   535 U.S. 813, 819 (2002)...................................................................15

*Segal v. Fifth Third Bank N.A.,*
   No. 1:07-CV348, 2008 WL 819290 (S.D. Ohio Mar. 25, 2008) ................................17, 18, 19

*Sterlin v. Biomune Sys.,*
   154 F.3d 1191, 1204 (10th Cir. 1998) ...................................................................28

*Stuyvesant v. Preston County Comm'n,*
   678 S.E.2d 872, 875-76 (W.Va. 2009) ...................................................................20

*Trafalgar House Constr., Inc. v. ZMM, Inc.,*
   567 S.E.2d 294, 300 (W. Va. 2002).......................................................23

*Troy Mining Corp. v. Itmann Coal Co.,*
   346 S.E.2d 749, 752 (W. Va. 1986).......................................................25

*United States v. O'Hagan,*
   521 U.S. 642 (1997) ...................................................................15, 17

*Univ. of W. Va. Bd. of Trs. v. Voorhies,*
   84 F. Supp. 2d 759, 768 (N.D. W.Va. 2000) ...........................................19, 27

*W. Va. Educ. Assoc. v. Consol. Pub. Ret. Bd.,*
   460 S.E.2d 747 (W. Va. 1995).......................................................4, 5

*White v. Nat'l Steel Corp.,*
   938 F.2d 474, 490 (4th Cir. 1991) ...................................................................22

*Wright v. Colosi,*
   No. 1:08-00005, 2009 WL 915553, at *4 (S.D. W. Va. Mar. 31, 2009) ................................25

**STATUTES**

15 U.S.C.
    §§ 77p(f)(2)(A)(i)(II), 78bb(f)(5)(B)(i)(II) ...................................................................13
    §§ 77p(f), 77r(b), 77bb(f) ...........................................................................................13

17 C.F.R. § 240.10b-5 ...................................................................................................16

Pub. L. No. 105-353, 112 Stat. 3227 (1998) .................................................................13

W. Va. Code
    § 18-7B-1 (1992) ...............................................................................................3, 4, 5
    § 18-7B-7A (1992) .....................................................................................................5
    § 18-7B-8-9 (1992) ....................................................................................................5
    § 18-7D-1 (2008) .....................................................................................................10
    § 18-7D-3(b) ......................................................................................................10, 11
    § 18-9A-6a(c) (1994) .................................................................................................5
    § 55-2-12 (1959) ................................................................................................19, 27

**RULES**

Fed. R. Civ. P.
    12(b)(6) ..............................................................................................................11, 12
    23............................................................................................................................14
    26..............................................................................................................................2
    56(c) ......................................................................................................................26
    902(6) ......................................................................................................................4

**OTHER AUTHORITIES**

H.R. Rep. No. 105-640 (1998) ................................................................................12, 13

RESTATEMENT (SECOND) OF TORTS § 538A .................................................................22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| CHERYL DOUGHERTY, individually,<br>and on behalf of all others similarly situated, | §<br>§<br>§ | |
| Plaintiff, | §<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 2:09-443 |
| RAMONA CERRA, *et al.* | §<br>§ | |
| Defendants. | §<br>§ | |

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THIRD AMENDED COMPLAINT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

---

Defendants Ramona Cerra, John Cook, Greg Garrett, George Edwards, Clarence Burdette, Roland Rich, Luther Cope, The Variable Annuity Life Insurance Company (VALIC), AIG Retirement Advisors, Inc. (n/k/a VALIC Financial Advisors, Inc.), and AIG Retirement Services Company (n/k/a VALIC Retirement Services Company)[1] (collectively, "Defendants") submit this Memorandum in support of their Motion to Dismiss Plaintiff's Third Amended Complaint ("TAC") or, in the alternative, Motion for Summary Judgment and would respectfully show as follows:

### *Preliminary Statement*

Defendants removed this suit to federal court on grounds that Plaintiff Cheryl Dougherty's state law claims are barred by the Securities Litigation Uniform Standards Act of 1998 (SLUSA) because they allege fraud and misrepresentation in connection with the sale of registered securities. Soon after removal, in an attempt to avoid SLUSA and federal jurisdiction,

---

[1] VALIC, AIG Retirement Advisors, Inc., and AIG Retirement Services Company are referred to collectively as "VALIC" for the purposes of this motion.

1

Dougherty told the Court she intended to amend her complaint, to delete her "securities fraud claims," and then to move to remand. (*See* Docket Entry Nos. 21 & 25 for the Parties' Report of Rule 26 Meeting and Plaintiff's Motion to Remand). However, Dougherty's claims in her Third Amended Complaint (TAC) are also barred by SLUSA because she alleges essentially the same claims as before—specifically, that VALIC representatives defrauded Dougherty and others into permanently transferring their retirement savings from the Teacher Retirement System (TRS) into an investment platform (the Defined Contribution Plan or DCP) that offers, among other options, registered securities. In short, Dougherty's still alleges misrepresentations in connection with the sale of securities—and thus SLUSA bars this suit.

Dougherty's fraud and misrepresentation claims are also barred because she did not file suit until many years after the two-year limitations period had expired. Dougherty alleges that the misrepresentations causing her to transfer to the DCP may have occurred as far back as 1990—*eighteen years before she filed this suit.* The discovery rule does not apply to salvage her claims here because, at the time she enrolled in the DCP, Dougherty was aware of all the facts she needed to "discover" her claim against VALIC. Moreover, the West Virginia press widely reported allegations against VALIC nearly identical to hers more than six years before she filed suit—allegations that were investigated and later dismissed as groundless by the West Virginia Insurance Commissioner. The allegations of the TAC, taken together with facts of which this Court may take judicial notice, warrant dismissal of Dougherty's fraud claims.

Apart from SLUSA and limitations, Dougherty's claims fail as a matter of law. The crux of her complaint is that VALIC convinced her to become a DCP participant after a meeting during the 1990-1991 school year by making her believe that the TRS was underfunded and might have trouble meeting its obligations one day. However, Dougherty may not base a claim

of fraud on mere predictions or stated expectations.  In any event, the concern VALIC is alleged

to have expressed (among many others who certainly did) rings true even today.  According to a

recent study by the Pew Charitable Trusts, "[w]hen it comes to pension funding levels, West

Virginia—with about 55% of its aggregate pension obligations covered—*lags behind every*

*other state*." (*See* RJN Exh. #7) (emphasis added).  At the time of the Pew report, West Virginia

had unfunded pension liabilities of $5.3 billion.  (*Id.*)  In fact, this gap remains a serious concern,

as the *Charleston Gazette* reported just this week.  (*See* RJN Exh. #15).

The record will show that in 1990, when the West Virginia legislature created a plan to

make its teachers' retirements more secure,[2] VALIC and several other investment providers

stepped forward to help.  The State did not establish the DCP to hurt teachers, but to help them.

To that end, the CPRB obtained a fixed annuity from VALIC that it offered DCP Plan

participants as an investment option alongside four other choices that included three mutual

and/or bond funds, all registered securities.  The VALIC Annuity has provided steady growth to

participants even in recent volatile times, yielding a 4.5 percent return while many other

investments lost a large percentage of their value.

For these and other reasons stated below, the Court should dismiss the Third Amended

Complaint or, alternatively, grant summary judgment in favor of the defendants.

## FACTUAL BACKGROUND

### *West Virginia's State Retirement System's Trouble*

Prior to 1991, public school educational employees in West Virginia's K-12 schools

participated in the Teacher Retirement System (TRS), a defined benefit pension plan.  (*See*

Defendants' Appendix (Def. Appx.), Exh. # 1; Defendants' Request for Judicial Notice (RJN),

---

[2] W. Va. Code  § 18-7B-1 (1992), *et seq.*, entitled "The Teachers Defined Contribution Retirement System," was passed in 1990, during the third extended session of the legislature.

Exh. # 2).[3]  The TRS required teachers to contribute six percent of their pre-tax salary, which was matched and wholly managed by the state.  (*See* Def. Appx. Exh. #2).  Under this plan, teachers became vested only after they completed twenty years of service.  (*Id.*)  The amount of a teacher's pension upon retirement is determined by the number of years that teacher was employed and the highest level of salary he or she achieved.  However, for nearly forty years, the TRS was severely under-funded and, by the early 1990s, it had a deficit of approximately $3 billion.  (*See e.g.,* RJN Exhs. #2, #3, & #6).[4]  Thus, according to some reports, the fund would be unable to pay $80 million in pensions owed to teachers by 2003. (*See* RJN Exh. #3).

### The Legislature Comes to the Rescue

In 1989, newly elected Governor Gaston Caperton appointed a task force[5] to respond to the looming crisis and pressure from teachers' unions.[6] (*See* RJN Exh. #2).  Shortly thereafter, the legislature enacted H.B. 2963 and H.B. 4507, codified at W. Va. Code § 18-7B-1 (1992), which created the West Virginia Teachers' Defined Contribution Plan (the "DCP") (*See* RJN

---

[3] This article is admissible under Federal Rule of Evidence 902(6), as it is self-authenticating. Fed. R. Evid. 902(6).

[4] In fact, recent reports have commented that the TRS is still severally underfunded by over $5 billion. (*See* RJN Exhs. #7 & #15).

[5] "On March 15, 1989, Governor Gaston Caperton signed an executive order creating the Governor's Task Force to study public pensions." *See W. Va. Educ. Assoc. v. Consol. Pub. Ret. Bd.,* 460 S.E.2d 747 (W. Va. 1995). (*See* Def. Appx. Exh. #11 for a copy of the opinion.)

[6] Indeed, in one article, written by David Haney, who was Executive Director of the West Virginia Education Association, characterized the need for creating the DCP as follows:

> Why was the DC model adopted?  In the late 1980's, the old DB plan faced a legal challenge from the West Virginia Education Association after forty years of under funding by the State that had resulted in an unfunded liability of over three billion.  In 1990, newly elected Governor Gaston Caperton appointed a task force, of which I [Haney] was a member, composed of legislators and citizens, to develop a long term solution.  We found that due to the history of funding abuses by the State, employees had a high level of distrust and they wanted control of their retirement contributions and investments. The task force recommended a defined contribution plan in the legislature, along with a series of other pension reforms to address the funding of the old DB plan.

(*See* RJN Exh. #2).

Exhs. #4 & #5).[7]  Both the DCP and the TRS are qualified retirement plans under the Internal Revenue Code of 1986, as amended (the IRC).  (*See* Def. Appx. Exh. # 20).  However, the DCP operates very differently from the TRS.  Under the DCP, a fixed percentage of a teacher's income is contributed to the plan each year until retirement.  (*See* Def. Appx. Exh. #2; RJN Exhs. #1a, #1b, & #3).  That is, the teacher contributes four and a half percent of her gross salary and the employer contributes seven and a half percent of the gross salary for a total of twelve percent annually.  (*Id.*)  All of these contributions are invested among the DCP's investment options at the employees' direction.  (*Id.*)  Thus, teachers and other educational employees contribute to and play a part in managing their own retirement savings under the DCP.  (*See* RJN Exhs. #1a, at VAL000019 & #1b, at P 00000002; Def. Appx. Exhs. #2, #3, at VAL000967 & #4, at 5).  Educational employees hired after July 1991 could not participate in the TRS, and instead were required to participate in the DCP.  Those who were already employed as of July 1991 could either remain as TRS participants or become DCP participants.  (*Id.*)

From inception, the West Virginia Consolidated Public Retirement Board (the CPRB) has administered the DCP.  (*See* Def. Appx. Exhs. # 1 & # 10).  The CPRB has selected the

---

[7] Reform was also sparked by a lawsuit initiated by the West Virginia Educational Association (WVEA), which ultimately reached the Supreme Court of Appeals of West Virginia. *See W. Va. Educ. Assoc.*, 460 S.E.2d 747. (*See* Def. Appx. Exh. #11 for a copy of the opinion.)  The WVEA essentially argued that the Governor and others had administered the TRS in an unsound manner in violation of the state constitution. *Id.*  Before the Supreme Court of Appeals was whether the circuit court had properly issued an injunction preventing certain transfers from TRS funds. *Id.*  Among other things, the Court held that the issue of whether measures taken to correct the TRS' unfunded liability was moot because the legislature had passed S.B. 1000, found at W. VA. Code 18-9A-6a(c) (1994).  Indeed, the Court found that the legislation showed that West Virginia was now funding its teachers retirement system on an "actuarially sound basis" and that the "legislation (S.B. 1000) finally provides a definitive solution to the nagging problem of one of our state's two largest debts—$3 billion unfunded liability of its largest retirement system." *Id.* at 757, 511.

After S.B. 1000 was passed, the legislature then enacted H.B. 4507, known as the "Teachers' Retirement Reform Act" and codified at W. VA. Code § 18-7B-1 (1992), *et. seq.*, which provided that after July 1, 1991, the Teachers' Defined Contribution System would be the single retirement program for all new employees whose employment commenced after that date. W.VA. Code § 18-7B-7A (1992).  The new law also provided that old employees may elect into the system and that each employee's contribution was 4.5% with the employer matching at 7.5%. W. VA. Code § 18-7B-8-9 (1992).

investment options made available to DCP participants, and the CPRB contracts directly with the investment providers to provide each such option within the DCP.   (*Id.*)   The DCP has offered a number of investment options within the DCP, including stocks, bonds, money market accounts, a guaranteed investment fund, and the VALIC Annuity. (*See* Def. Appx. Exhs. #2 & #3; RJN Exhs. #1a & #1b). The VALIC Annuity was offered as an investment option under the plan after the CPRB entered into an annuity contract with VALIC in October 1991. (*See* Def. Appx. Exhs. #13 & #14).

The VALIC investment option under the DCP provides for a guaranteed crediting rate that may fluctuate but which may never drop below 4.5 percent. (*See* Def. Appx. Exh. #13, at 4; RJN Exh. # 13, at 4). In 1992, the interest rate under the VALIC Annuity was 8.5%. (*See* Def. Appx. Exh. #14). Participants were, and still are, permitted to invest in any combination of the investment options in multiples of twenty percent, and to change investments at the beginning of each calendar quarter. (*See* RJN Exhs. #1a, at VAL000019 & #1b at P 00000001).[8]

The CPRB has contracted with a third party administrator (a "TPA") to provide administrative and record keeping services to the DCP, it participants, and the participants'

---

[8] All of this information was publically available in a number of sources, including the State's informational pamphlet. (*See* RJN Exhs. #1a & #1b). This pamphlet not only informed the participants that

> You may change investment options or reallocate current investments each quarter. There is no charge for these changes. Four of the investment options have no restrictions with respect to withdrawals; however, if you wish to withdraw from Valic and invest in the money market account or the guaranteed investment contracts fund, Valic will only allow the transfer of 20% of your account annually. Valic imposes no restrictions on transfers to the stock fund or bond fund.

The pamphlet also warned that

> No investment carries an absolute guarantee. All investments have some element of risk. As an illustration, even United States Treasury securities, the safest of all investments, carries some risks. Usually, the greater the risk taken, the greater the potential there is for reward. You should choose a risk/reward investment mix which best suits your individual needs.
> Your retirement benefit will be based solely on the accumulation of dollars in your account at the time of retirement.

(*Id.*)

beneficiaries. (*See* Def. Appx. Exh. #1).  Great-West Retirement Life & Annuity Insurance

Company ("Great-West") is the current TPA for the DCP.  (*See* Def. Appx. Exh. #15, at 1).

Prior to Great-West, Milliman and Robertson acted as the DCP's TPA.  (*See* RJN Exh. #1a at

VAL000019).

### *Cheryl Dougherty Enrolls in the DCP*

This suit centers on Dougherty's allegation that Defendants fraudulently induced her to

transfer her retirement funds from the TRS to the DCP.  (TAC ¶¶ 2, 5, 6).  Specifically,

Dougherty alleges that, during the 1990-1991 academic year, VALIC representative Ramona

Cerra met with her at the school in Marshall County where Dougherty worked.  (TAC ¶ 34).

Dougherty alleges VALIC set up this meeting for the sole purpose of misrepresenting the

benefits of the DCP so that Dougherty (and other similarly situated teachers) would leave the

TRS and become DCP participants, choosing the VALIC's Annuity as their investment option.

(TAC ¶¶ 5, 6, 35).

Dougherty alleges that Cerra led her to believe that Cerra was a representative of the

CPRB, and that Cerra made the following misrepresentations and misleading statements:

- the TRS was in "grave danger" and/or was going bankrupt;

- there would be no retirement funds available for Dougherty by the time she was fifty-five;

- transferring into the DCP was in her best interest because it was "guaranteed" to perform "significantly better" than the TRS, even if the TRS remained solvent;

- there was a new system (the DCP) that "would save us," "allow us to regain our losses," and "allow us to retire with even better benefits than our peers"; and

- Dougherty was required to make an immediate decision to purchase and/or transfer her retirement fund account to the Annuity.

(TAC ¶ 6, 36).  Dougherty also complains that VALIC, through Cerra, intentionally omitted

information concerning "the nature of the Annuity, its projected performance and related terms

6389291                                        7

and conditions, the fact that Cerra's exorbitant commission on the sale of the Annuity was front-loaded, and the terms and conditions of the Annuity contract, including but not limited to its surrender charge penalty provisions." (TAC ¶ 38). She alleges that "unconscionable" terms were "unilaterally" inserted into the Annuity, and that these terms were never explained to her. (TAC ¶¶ 2, 5, 6, 9, 10, 24, 52-57).

### Dougherty's Investment in the Annuity and Transfer to Another DCP Investment

On April 30, 1992, Dougherty enrolled in the DCP, leaving the TRS as a participant. Initially, she selected only the VALIC Annuity from among the available options. (*See* Def. Appx. Exh. #5; RJN #13). Dougherty received a number of documents explaining how the DCP worked, as well as illustrations of projected benefits. (*See* RJN Exhs. #1a & #1b; Def. Appx. Exhs. #2, #6, & #15). These documents compared the TRS and DCP, informed Dougherty how both plans worked, and provided information to help her make a decision. (*Id.*) In addition, Dougherty received a certificate setting forth the terms of Annuity. (*See* RJN Exh. #13).

The documents Dougherty received identified the five investment options she could choose from under the DCP:  three that were securities, including a money market fund, a bond fund, and a stock fund; and two that were not securities, including a guaranteed investment contract and the VALIC fixed annuity. (*See* Def. Appx. Exhs. #1, at 4, 7-8, #2; RJN Exhs. #1a & #1b). These documents also informed Dougherty that each quarter she had the right both to move her current account balance and re-direct her future contributions to the other investment options in the DCP, by completing a Reallocation, Investment & Address Change Form. (*See* RJN Exhs. #1a at VAL00019, #1b at P 00000002, & #13, at 4-5). No penalty or charge was assessed for the transfer of money among the various options. (*See* RJN Exh. #1b at P 00000001; Def. Appx. Exh. #8, at 8). Dougherty, in fact, exercised the option to transfer out

of her chosen investment, as she transferred from the Annuity to another plan investment in 1997. (*See* Def. Appx. Exh. #7).  Dougherty was charged no fees for the transfer.  (*Id.*)

### Press Reports Question Whether Switching to DCP was a Mistake

Ten years after the DCP was created, in the midst of what one West Virginia reporter called "another topsy-turvy ride on the Wall Street roller-coaster," (*See* RJN Exh. # 14), the press reported that the state insurance commissioner had launched an investigation into VALIC's sales practices, including its enrollment of teachers in the DCP. (*See* RJN Exh. #8).  This investigation was reportedly sparked by complaints by teachers that VALIC representatives had pressured them into switching out of the TRS and into the DCP.  (*Id.*; *see also* RJN Exhs. #9, #11, & #12).[9] The nature of the teachers' complaints was identical to those alleged in this suit.  (*Id.*) Specifically, the articles reported that agents for VALIC acted improperly in a number of ways: they did not identify themselves as VALIC representatives; they often had personal information about the teachers, which led the teachers to believe they were representing the school system; they pressured the teachers into making snap decisions to switch plans after a brief presentation; they provided inaccurate projections of future earnings; they urged people to switch over because the old plan was about to "go under"; and they led people into investing all of their money in the VALIC Annuity.  (*Id.*)  In response, the State conducted an investigation, but concluded there was no evidence to support the allegations of wrongdoing. (*See* Def. Appx. Exh. # 9).

### Subsequent Legislation Regarding the Merger of Two Retirement Systems

In 2006, the State considered whether to merge the TRS with the DCP.  Teachers were asked to vote on whether they approved of such a merger. (*See* Def. Appx. Exh. #12).  To

---

[9] These complaints, however, were without merit for two reasons.  First, DCP participants knew that the DCP was subject to market volatility.  Indeed, such volatility occurred in 2000 and on September 11, 2001.  Second, and most importantly, despite this volatility, none of the VALIC investors lost any money as VALIC continued to pay the minimum guaranteed rate of interest under the contract.  (*See e.g.*, RJN Exh. #13).

facilitate the vote, the CPRB provided a document to its participating teachers entitled "Raise

Your Hand," which in turn referred teachers to a website. (*Id.*)  This website permitted teachers

to sign in with a password and access information comparing the two plans so that they could

make an informed decision about the merger.  (*Id.*)

In 2008, the legislature passed  the "Voluntary Transfer from Teachers' Defined

Contribution Retirement System to State Teachers' Retirement System," to allow teachers in the

DCP to transfer their account balances back to the TRS.  *See* W. Va. Code § 18-7D-1 (2008).  If,

however, at least 65% of actively contributing members of the DCP elected to transfer to the

retirement system by July 1, 2008, the CPRB would be required to move all assets from the DCP

into the TRS.  *See,* W. Va. Code § 18-7D-3(b); 18-7D-7(d) (2008).

### *Dougherty Brings Suit*

Dougherty did not file suit until May 12, 2008[10]—16 years after she enrolled, 11 years

after she transferred out of the VALIC Annuity investment option, and 6 years after the flood of

media coverage that first asserted the complaints she makes here.  Dougherty justifies this delay

by alleging she was not aware of the facts supporting this suit until she received a statement from

the WVPRB in April 2008.  (TAC, ¶¶ 8-10).  According to Dougherty, this statement revealed,

for the first time, the "actual and true projections of what [she] would earn under the DCP with

the Annuities purchased . . . in comparison to the projected hypothetical retirement plan value

and earnings had [she] remained in . . . the TRS."  (*Id., ¶* 8)

---

[10]  *See* Def. Appx. Exh. # 8.  Dougherty named VALIC Financial Advisors, Inc. (VFA) and VALIC
Retirement Services Co. (VRSCO) in her lawsuit, even though these two companies did not exist until November
18, 1996, which was four and half years after she enrolled in the DCP.  (*See* Def. Appx. Exhs. #16 & #17).  VFA
was not authorized to do business by the NASD or the SEC until June 20, 1997, which was after she transferred
from the VALIC investment to another investment in the DCP.  (Def. Appx. Exhs. # 7, #21).  Further, neither VFA
nor VRSCO issued the Annuity.  (*See* RJN Exh. # 13).

Specifically, Dougherty contends that she did not realize she was "actually losing retirement funds with Defendants' Annuity and/or that [the] Annuity had in reality performed significantly below the levels guaranteed by the Defendants . . . causing [her] to suffer significant damages" until she received this statement. (*Id.*) She also contends the statement first informed her that she could switch back to the TRS "at significant personal cost" and of the "unconscionable terms" of the VALIC Annuity. (TAC ¶¶ 9-10). However, during the entire time Dougherty remained in the VALIC investment option, she received quarterly statements showing the Annuity's performance. (*See* Def. Appx. Exh. #7). She transferred out of the VALIC investment option in 1997, even before media coverage in 2002 of the dozens of identical complaints by other teachers. (See Def. Appx. Exh. # 7; RJN Exhs. ##8-12).

On April 24, 2009, Defendants removed this suit to federal court on the basis that Dougherty's class action claims in her Second Amended Complaint were barred by SLUSA. In May 2009, in an attempt to avoid SLUSA preemption, Dougherty announced her intention to "delete the securities fraud claims against the defendants, and then to move to remand this case to State Court." (*See* Docket Entry No. 21). On June 25, 2009, Dougherty filed her Third Amended Complaint. (*See* Docket Entry No. 28).

## ARGUMENTS

### I.    Dougherty's Claims Should Be Dismissed Under Rule 12(b)(6)

#### A.    Standard of Review.

A Rule 12(b)(6) motion operates to test the sufficiency of a complaint. When considering a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court will construe factual allegations in the non-moving party's favor and will treat them as true, but the court is not bound by the complaint's legal conclusions. *See* Fed. R. Civ. P. 12(b)(6); *Robinson v. Am. Honda Motor Co., Inc.,* 551 F.3d 218, 222 (4th Cir. 2009); *Schatz v. Rosenberg,*

943 F.2d 485, 489 (4th Cir. 1991).  To survive a Rule 12(b)(6) motion to dismiss, the facts

alleged "must be enough to raise a right to relief above the speculative level" and must provide

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,*

550 U.S. 544, 555, 570 (2007).  If a plaintiff alleges state law claims that fall under the ambit of

SLUSA, the claims are preempted and must be dismissed. *Merrill Lynch, Pierce, Fenner &*

*Smith Inc. v. Dabit,* 547 U.S. 71, 78-83 (2006).

### B.   SLUSA Mandates Dismissal of this Suit.

SLUSA was enacted to prevent exactly the type of vexatious litigation that Dougherty's

suit represents.  Prior to SLUSA's enactment, Congress passed the Private Securities Litigation

Reform Act of 1995 (PSLRA) to create substantive and procedural hurdles to protect defendants

from abusive and meritless securities fraud lawsuits. *See Lowinger v. Johnston,* No. 3:05CV316-

H, 2005 WL 2592229, at *3 (W.D.N.C. Oct. 13, 2005) (citing 15 U.S.C. §§ 77z-1(b)(1), 77z-2).

After the reform, however, plaintiffs creatively avoided the PSLRA's restrictions by avoiding

federal court venues entirely. *Id.*  Congress, therefore, enacted SLUSA, to address this

unintended consequence. *Id.*  SLUSA sought to prevent the forum-shifting by making federal

courts "the exclusive venue for most securities class action lawsuits."  H.R. Rep. No. 105-640, at

10 (1998).[11]  The express purpose of SLUSA, therefore, was to "prevent plaintiffs from seeking

---

[11]  The "Findings" section of the SLUSA states:
   Section 2. FINDINGS.  The Congress finds that
   (1) the Private Securities Litigation Reform Act of 1995 sought to prevent abuses in private securities fraud lawsuits;
   (2) since enactment of that legislation, considerable evidence has been presented to Congress that a number of securities class action lawsuits have shifted from Federal to State courts;
   (3) this shift has prevented that Act from fully achieving its objectives;
   (4) State securities regulation is of continuing importance, together with Federal regulation of securities, to protect investors and promote strong financial markets; and
   (5) in order to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act of 1995, it is appropriate to enact national

to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than Federal, court." *Id.* Indeed, Congress set out "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate" federal objectives and enacted "national standards for securities class action lawsuits involving nationally traded securities." Pub. L. No. 105-353, 112 Stat. 3227 (1998). Therefore, SLUSA completely preempts state law based, private class actions alleging fraud or manipulation touching on the purchase or sale of securities.

The test for preemption under SLUSA is simple. If a plaintiff's claim 1) is a "covered class action"; 2) alleges a misrepresentation, untrue statements or an omission of a material fact; and 3) the misrepresentations were made "in connection with the purchase or sale of a covered security," then the suit is preempted and must be dismissed. 15 U.S.C. §§ 77p(f), 77r(b), 77bb(f); *In re Mut. Funds Inv. Litig.,* 309 Fed. Appx. 722, 725 (4th Cir. 2009); *see In re Mut. Funds Inv. Litig.,* 384 F. Supp. 2d 845, 871 (D. Md. 2005); *Potter v. Janus Inv. Fund*, 483 F. Supp. 2d 692, 696 (S.D. Ill. 2007). Despite Dougherty's attempt to plead around SLUSA, there is no doubt that her suit satisfies this test.

### 1. Dougherty's Suit is a Covered Class Action.

A "covered class action" includes "any single lawsuit in which . . . one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members." 15 U.S.C. §§ 77p(f)(2)(A)(i)(II), 78bb(f)(5)(B)(i)(II). When plaintiffs are

---

standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators and not changing the current treatment of individual lawsuits. Pub. L. No. 105-353, 112 Stat. 3227 (1998).

suing in their representative capacity, the suit qualifies as a covered class action.  *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir. 2001).

Here, Dougherty specifically alleges that the action is brought "by the Plaintiff as a class action, individually and on behalf of all others similarly situated under the provisions of Rule 23." (TAC ¶ 21).  She also alleges that common questions of law or fact predominate over individual ones (TAC ¶ 24), her claims are typical of the class claims (TAC ¶ 25), and that she seeks compensatory and punitive damages common to the Class (TAC ¶27).  Dougherty's suit, therefore, is a "covered class action" within the meaning of SLUSA.

### 2.    Dougherty Alleges Misrepresentations of Material Facts.

Dougherty cannot dispute that she alleges "a misrepresentation or omission of a material fact." *In re Mut. Funds Inv. Litig.*, 437 F. Supp. 2d 439, 443 (D. Md. 2006), "Preemption does not turn on whether allegations are characterized as facts or as essential legal elements of a claim, but rather on whether the SLUSA prerequisites are 'alleged' in one form or another." *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294, 300 (3d Cir. 2005).

Here, Dougherty's Complaint is replete with allegations that Defendants made misrepresentations during her enrollment in the DCP.  Dougherty enrolled in the DCP, an investment platform that offered a suite of securities and non-securities investments.  (*See* RJN Exhs. #1a & #1b; Def. Appx. Exhs. #2 & #3).  Specifically, the DCP initially offered five different investment options, including stocks, bonds, money market funds, as well as a guaranteed investment contract, and the VALIC Annuity. (*Id.*)  Dougherty claims that Defendants induced her and other class members to transfer their retirement funds into the DCP by misrepresenting material facts about the future possible performance of an investment in the

DCP platform, by failing to disclose commission payments made to Ramona Cerra,[12] and by failing to disclose the existence of surrender charges. (*See* TAC ¶¶ 2, 6, 8-10, 36). These allegations, incorporated by reference in every count of the Complaint, easily satisfy the misrepresentation element required for SLUSA preemption. (*See* TAC ¶¶ 41-57). Dougherty's claims, therefore, fall under SLUSA and are preempted.

### 3. Defendants' Alleged Misrepresentations Coincide With the Purchase or Sale of a Covered Security.

The United States Supreme Court mandates that SLUSA's "in connection with" requirement be construed very broadly and has instructed courts to construe the phrase "not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford,* 535 U.S. 813, 819 (2002). Moreover, for the purposes of SLUSA preemption, the identity of the plaintiffs does not determine whether the complaint alleges fraud "in connection with the purchase or sale" of securities; rather, it is the alleged conduct of the defendant that is determinative. *Merrill Lynch, Pierce, Fenner & Smith v. Dabit Inc.,* 547 U.S. 71, 89 (2006). Thus, it is enough that the alleged fraud simply "coincide" with a securities transaction—whether by plaintiffs or someone else. *Dabit,* 547 U.S. at 85 (citing *United States v. O'Hagan,* 521 U.S. 642, 651 (1997)). "The requisite showing, in other words, is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller." *Id.* (internal quotations and citations omitted); *see also In re Mut. Funds Inv. Litig.,* 437 F. Supp. 2d 439, 444 (D. Md. 2006). Because the scope of SLUSA is as broad as that of the Securities Exchange Act of 1934, *Dabit,* 547 U.S. at 85-86, SLUSA does not require that the alleged fraud have a direct or close relationship with the purchase or sale; the fraud need only "touch" the

---

[12] All commissions are paid by VALIC and not the participants. (*See* Def. Appx. Exh. # 19). One hundred percent of amounts contributed to the VALIC investment option were credited to participant accounts. (*Id.*) Any allegation or suggestion to the contrary is wholly without merit.

transaction involving the alleged fraud. *Brown v. Ivie*, 661 F.2d 62, 65 (5th Cir. Unit B. Nov. 1981) (finding "in connection with" requirement satisfied where majority shareholders were alleged to have fraudulently induced minority shareholders to enter agreement that would require shareholders upon leaving the corporation to sell their stocks at below market value).[13] For an alleged misrepresentation to touch the sale of securities, it need not be made in connection with the purchase or sale of a specific security. *Gray v. Seaboard Sec., Inc.*, 126 Fed. Appx. 14, 16 (2d. Cir. 2005).

The Supreme Court does not require that a direct purchase occur in order for SLUSA to apply. *See Dabit,* 547 U.S. at 85. Instead, Dougherty need only plead that the fraud or omission coincided with a securities transaction by someone else, which she has clearly alleged here. Indeed, the crux of Dougherty's complaint is that Defendants misrepresented how the DCP would perform in comparison to the TRS and these alleged misrepresentations induced her, and other similarly situated teachers, not only to select the VALIC investment option but to enroll in the DCP. (TAC, ¶¶ 6-10, 34-44). The DCP, however, was an investment platform that not only offered the VALIC Annuity, but also a number of securities investments such as stocks, bonds, and a money market fund. (*See* RJN Exhs. # 1a & #1b; Def. Appx. Exhs. #2 & #3).[14] Moreover, all of the DCP participants were permitted to invest in registered securities, either initially or once at the beginning of each quarter—and many, like Dougherty, did just that. (*Id.*)

---

[13] Although *Brown* was decided prior to the enactment of SLUSA, it is still persuasive. SLUSA §78bb(f)(1)(B) mirrors Section 10b-5 of the Securities Act, which makes it unlawful for "any person . . . [t]o make any untrue statement of material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security." *See* 17 C.F.R. §240.10b-5. The substantial body of case law interpreting 10b-5, therefore, provides guidance for interpreting the similar provision under SLUSA.

[14] In fact, the investment options have more than tripled since Dougherty's initial enrollment. By June 2008, DCP participants could select from nine different mutual funds, three "profile" options, which were asset allocation models investing in securities, and the VALIC option. (*See* Def. Appx. Exh. # 18). The default option became the "Conservative Profile"; thus, even participants who made no investment selections were defaulted into a securities option. (*Id.*)

Thus, while Dougherty chose initially to invest in the VALIC investment option, other teachers, including those on whose behalf she filed this suit, invested solely in the securities options or a combination of investment options made available under the DCP. Further, participation in the various options was fairly fluid; participants could and did move their money into and out of the various investment options.[15] Dougherty's allegations, in fact, extend to these other class members, as she contends that Defendants not only fraudulently induced her but other similarly situated teachers into enrolling into the DCP. Just as importantly, the bulk of the alleged misrepresentations concerned the value of investing in the DCP (which included securities options) rather than the characteristics of the VALIC Annuity. And because it is Defendants' conduct that is determinative, and the alleged fraud can coincide with the purchase of securities by the other class members, Dougherty's claims clearly fall with SLUSA's ambit. *See Dabit,* 547 U.S. at 85 (citing *O'Hagan,* 521 U.S. at 651).

Courts, in fact, have found preemption in similar contexts. *Segal v. Fifth Third Bank N.A.* is instructive on this issue. No. 1:07-CV348, 2008 WL 819290 (S.D. Ohio Mar. 25, 2008). In *Segal,* plaintiff was a beneficiary of a fiduciary trust account administered by defendant Fifth Third Bank. *Id.* He alleged that the defendant Bank failed to exercise good faith by engaging in self-interested or imprudent asset placement decisions for fiduciary accounts, failed to "undertake a trust-by-trust analysis" of each fiduciary account, and instead, uniformly decided that the assets be invested in defendant Fifth Third Fund, and the Bank violated its fiduciary obligations and disregarded potential adverse tax consequences to the account beneficiaries by engaging in standard portfolio management rather than individualized trust administration. *Id.*

---

[15] Dougherty, in fact, transferred her DCP assets out of the Annuity in 1997. (*See* Def. Appx. Exh. # 7).

Plaintiff further asserted that these actions amounted to a breach of fiduciary duty, unjust enrichment, and breach of contract. *Id.* at *2.

In response to defendant's SLUSA motion to dismiss, plaintiff argued that SLUSA did not apply because defendants' conduct was not "in connection with" the purchase and sale of covered securities. *Id.* at *6. Plaintiff insisted that he did not directly purchase any securities, nor did he have any knowledge of such purchases because defendants made all decisions regarding securities allocations in the trust accounts. *Id.* Plaintiff instead argued that his claim was based on the breach of fiduciary duty inherent in Fifth Third's decision to purchase funds for the accounts. *Id.* The court rejected this argument and dismissed plaintiff's state law claims, finding that it was foreclosed by *Dabit*. *Id.* More specifically, the district court—like the Supreme Court in *Dabit*—held the plaintiff need not allege that the fraud be committed in connection with his direct purchase of a security; rather, the fraud need only "coincide with a securities transaction—whether by the plaintiff or someone else." *Id.* (quoting *Dabit*, 547 U.S. at 85). And because plaintiff's factual allegations coincided with defendants' securities activities, this was sufficient to meet the "in connection with" element of SLUSA. *See also Kurz v. Fid. Mgmt. & Research Co.*, No. 07-CV-709-JPG, 2008 WL 2397582, at *4 (S.D. Ill. June 10, 2008) (plaintiffs alleged that they had invested in defendants' mutual funds because they believed defendants' material misstatements about how defendants chose transaction brokers. Based on these allegations, the court concluded that the defendants' misstatements "coincide[d]" with the plaintiffs' purchase of a covered security (the mutual funds)).

Even though Dougherty—like the plaintiffs in *Segal* and *Kurz*—does not allege she directly purchased a registered security, she does allege that Defendants made misrepresentations and omitted material information in connection with the enrollment in the DCP, which did

contain securities investment options, and those allegations meet SLUSA's "in connection with" requirement as interpreted by *Dabit* and other instructive cases. *See Segal,* 2008 WL 819290, at *6; *Kurz,* 2008 WL 2397582, at *4. Accordingly, Dougherty's claims should be dismissed with prejudice. *See also Rowinski v. Salomon Smith Barney, Inc.,* 398 F.3d 294, 304-05 (3d Cir. 2005); *SEC v. Lauer,* 864 F. Supp. 784, 793 (N. D. Ill. 1994) (holding that "in connection with" requirement was satisfied where defendant allegedly induced plaintiffs to invest money in a pool, which money he represented would be used to purchase securities), *aff'd,* 52 F.3d 667 (7th Cir. 1995).

### C.   Dougherty's Fraud and Misrepresentation Are Barred by the Statute of Limitations.

#### 1.   The Two-Year Statute of Limitations Applies to Dougherty's Fraud and Negligent Misrepresentation Claims.

Dougherty's only substantive claims against Defendants are fraud and misrepresentation. (TAC ¶¶ 41-44).[16] Under West Virginia law, fraud and negligent misrepresentation are subject to a two-year statute of limitations. W. VA. CODE § 55-2-12 (1959); *Univ. of W. Va. Bd. of Trs. v. Voorhies,* 84 F. Supp. 2d 759, 768 (N.D. W.Va. 2000). According to Dougherty, all of Defendants' alleged fraudulent misrepresentations occurred during a presentation during the 1990-91 school year and upon the purchase of the VALIC Annuity. (TAC ¶¶ 10, 34-36). Dougherty, however, did not file this lawsuit until May 12, 2008—at least sixteen years later! Dougherty's claims, therefore, are barred by the statute of limitations and should be dismissed.

#### 2.   Dougherty's Claims Cannot Be Saved by the Discovery Rule.

The discovery rule does not save Dougherty's claims. Under the discovery rule, the statute of limitations begins to run at the time a plaintiff knows, or by the exercise of reasonable

---

[16] Dougherty also alleges claims of joint venture and civil conspiracy; however, as discussed in Section V below, these claims are not independent causes of action.

diligence, should know (1) that she has been injured, (2) the identity of the entity who owed her a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury. *Gaither v. City Hosp., Inc.*, 487 S.E.2d 901, 909 (W.Va. 1997). However, a plaintiff's ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of a statute of limitations; instead, the discovery rule only applies when the plaintiff demonstrates that the defendant's actions prevented the plaintiff from knowing of the wrong at the time of the injury. *Cart v. Marcum*, 423 S.E.2d 644, 648 (1992), *modified, Gaither v. City Hosp., Inc.*, 487 S.E.2d 901 (W. Va. 1997). Thus, to benefit from the tolling grace of the rule, a plaintiff "must make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship." *Id.*

To escape dismissal, Dougherty must plead facts to sustain the application of the discovery rule, which she has not done here. *See Stuyvesant v. Preston County Comm'n,* 678 S.E.2d 872, 875-76 (W.Va. 2009). Indeed, Dougherty's Complaint wholly fails to plead any of the necessary factors to support the application of the discovery rule in this case. For example, Dougherty claims Defendants failed to disclose the "unconscionable terms of the contract," including the onerous surrender charges; they misrepresented how the DCP would perform in comparison to the TRS in order to induce her to enroll in the DCP; they failed to inform her of Cerra's commissions; and they led her to believe that she had to make the enrollment decision immediately. (TAC ¶¶ 6, 36). But nowhere in the TAC does Dougherty allege that, despite the exercise of due diligence, she could not have discovered this alleged fraud until 2008. She also fails to allege facts showing that Defendants fraudulently concealed the facts that would put her

on inquiry notice of her claim or that she could not comprehend her injury or that some other extreme hardship prevented the discovery of her claim.

Instead, Dougherty simply contends that she learned of Defendants' alleged fraud in April 2008 after receiving a quarterly statement from the CPRB. (TAC, ¶¶ 8-10). However, the public debate in 2002 belies her conclusory assertion of discovery. In 2002, a number of teachers flooded the CPRB with complaints nearly identical to Dougherty's complaints here. (*See* RJN Exhs. ##8 -12). The teachers' complaints were reported in a number of local newspapers, which would have put her on constructive notice. Dougherty, therefore, should not be permitted to continue with this suit based on her conclusory allegation of discovery. Accordingly, Defendants ask the Court to dismiss her claims as barred by the statute of limitations.

**D.    Dougherty's Fraud Claims Regarding Performance and Failure to Disclose Fail as a Matter of Law.**

Dougherty's fraud allegations regarding performance and non-disclosure are two-fold: 1) Defendants misrepresented the future performance of the TRS plan as compared to the DCP; and 2) Defendants failed to disclose Cerra's commissions or surrender charges. (TAC, ¶¶ 6, 34-36). These claims, however, cannot survive dismissal because they are not actionable under West Virginia law.

**1.    Representations Regarding Any Future Performance of Investments Are Not Actionable as Fraud.**

Under West Virginia law, the essential elements in an action for fraud or misrepresentation are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (4) that he was damaged because he relied upon it. *Horton v. Tyree*, 139 S.E. 737, 738 (W. Va. 1927). Fraud cannot be predicated on

statements which are merely unfulfilled predictions or expectations, or erroneous conjectures as to future events. *White v. Nat'l Steel Corp.*, 938 F.2d 474, 490 (4th Cir. 1991) (citing *Janssen v. Carolina Lumber Co.,* 73 S.E.2d 12, 17 (W. Va. 1952)); *see also* RESTATEMENT (SECOND) OF TORTS § 538A. Here, Dougherty claims that, at some time between 1990 and 1991, VALIC told her that she should transfer her retirement funds from the TRS to the DCP because the DCP would allow her to retire—many years into the future—with better benefits than if she remained in the TRS. (TAC ¶¶ 2, 5, 34-40). Dougherty also claims that she learned in April 2008 that the representations made to her were false because—some eighteen years later—it appeared the TRS might offer better retirement benefits than she would receive based on her investment in the DCP. (TAC ¶ 8).

These alleged representations or misrepresentations were clearly a prediction of future events. As such, they cannot be the predicate for a fraud or misrepresentation claim. *See Poth v. Russey*, 99 Fed. Appx. 446, 456 (4th Cir. 2004) (holding that predictions regarding the IPO share price cannot serve as the basis for a fraud claim because they were not statements of present or pre-existing fact). Indeed, a defining characteristic of a defined contribution plan, according to the U.S. Bureau of Labor Statistics, is that there is no way to know how much a defined contribution plan will ultimately give the employee upon retiring.[17] Dougherty's fraud allegation, therefore, fails.

### 2. To the Extent Dougherty's Fraud Claim Hinges Upon a Duty to Disclose, it Cannot Survive Because VALIC Owed Her No Duty.

To state a claim for fraud based on non-disclosure, a plaintiff must initially establish a duty to disclose the allegedly concealed facts. *See, e.g., Livingston v. K-Mart Corp.*, 32 F. Supp.

---

[17] *See Glossary,* U.S. Bureau of Labor Statistics Division of Information Services, http://www.bls.gov/bls/glossary.htm#D (August 14, 2009).

2d 369, 374 (S.D. W. Va. 1998) (noting that under West Virginia law, "[f]raudulent concealment involves concealment of facts by one with knowledge, or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud"); *Trafalgar House Constr., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 300 (W. Va. 2002) (same). A duty to disclose arises when there exists a special or fiduciary relationship between the parties. *See Pocahontas Mining Co. L.P. v. OXY USA, Inc.*, 503 S.E.2d 258, 264 (W. Va. 1998) (Workman, J., concurring) ("[T]he legal duty to communicate depends upon the existence of a fiduciary relationship, or relation of trust and confidence between the parties, the value of a particular fact, the relative knowledge or inequality of condition of the parties, or other attendant circumstances." (quoting *Jim Walter Homes, Inc. v. Waldrop*, 448 So.2d 301, 306 (Ala. 1983)).

In this case, Dougherty contends that Defendants committed fraud by failing to disclose that Cerra would receive front-loaded commissions for the sale of the VALIC Annuity. (TAC ¶¶ 38, 41-44). However, Dougherty did not have a special or fiduciary relationship with the Defendants, nor does Dougherty allege one.[18] Absent a special or fiduciary relationship, the Defendants did not have a duty to disclose details regarding any alleged commissions to Cerra received. Accordingly, Dougherty claim for fraud based on the non-disclosure of information regarding commission payments fails.

### 3. Dougherty's Claim that VALIC Failed to Advise Her of Surrender Charges Have No Merit.

Dougherty further claims that VALIC failed to disclose the Annuity's surrender charges. (*See, e.g.*, TAC ¶10). Dougherty's claim cannot stand because the Annuity—referenced in the TAC—clearly states, among other things, that "there will be no surrender charges under this contract." (*See* RJN Exh. # 13, at P 00000041). Dougherty's assertion, therefore, completely

---

[18] *See* TAC ¶¶ 58-61 (only asserting that CPRB owed Dougherty a fiduciary duty).

contradicts the express terms of the Annuity.  Thus, Dougherty has no claim for fraud based on

non-disclosure, as she cannot assert such a claim based on non-existent terms of the Annuity.

*See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coe*, 313 F. Supp. 2d 603, 609 (S.D. W. Va.

2004) ("[T]he failure to read a contract before signing it does not excuse a person from being

bound by its terms." (citing *Reddy v. Cmty Health Found. of Man*, 298 S.E.2d 906, 910 (1982)));

*Reddy*, 298 S.E.2d at 910 ("Contracts are reduced to writing so that there can be no subsequent

argument concerning the terms of an agreement," and "[a] person who fails to read a document

to which he places his signature does so at his peril.").  For these reasons, Dougherty's non-

disclosure fraud allegation should be dismissed.

**E.     Dougherty's Claims of Conspiracy, Joint Venture and Unconscionability
        Also Fail.**

**1.     Dougherty's Conspiracy Claim Cannot Stand Because Defendants
        Cannot Conspire with Each Other or their Agents.**

Agreements between a parent corporation and its wholly owned subsidiaries cannot

constitute a conspiracy.  *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 703 (4th Cir. 1991).  Nor

are two subsidiaries wholly owned by the same parent corporation legally capable of conspiring

with one another.  *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 146

(4th Cir. 1990).  Further, since a corporation can act only through its agents, there cannot be a

conspiracy between a corporation and its agents.  *Gray v. Marshall County Bd. of Educ.*, 367

S.E.2d 751, 755 (W. Va. 1988); *Cook v. Heck's Inc.*, 342 S.E.2d 453, 460 (W. Va. 1986); *Dorsey

v. Chesapeake & Ohio Ry. Co.*, 476 F.2d 243, 245-6 (4th Cir. 1973).  Because VALIC cannot

conspire with one anther or with the other Individual Defendants, who Dougherty alleges to be

agents and employees of VALIC (TAC, ¶¶ 15-16), Dougherty's conspiracy claim must be

dismissed.

2.    **Joint Venture, Civil Conspiracy, and Unconscionability Are Not Independent Causes of Action.**

a)    **Civil conspiracy and joint-venture do not stand on their own.**

Civil conspiracy and joint-venture are not independent causes of action; rather, they are merely a means to impose liability on co-conspirators for an underlying tort. A civil conspiracy is defined as "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." *Wright v. Colosi*, No. 1:08-00005, 2009 WL 915553, at *4 (S.D. W. Va. Mar. 31, 2009). The cause of action is not created by the conspiracy, but upon the wrongful acts done by the defendants. *Dixon v. Am. Indus. Leasing Co.*, 253 S.E.2d 150, 152 (W. Va. 1979). Thus, absent the underlying wrongful act, there can be no liability for conspiracy. *Id.* Likewise, joint venture in and of itself is not a basis for liability. Under West Virginia law, a "joint venture" is merely "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge." *Armor v. Lantz*, 535 S.E.2d 737, 742-3 (W.Va. 2000). The existence of joint venture in and of itself is not a basis for liability, but merely a means of establishing vicarious liability. *Id.*

Here, while Dougherty asserts claims of conspiracy and joint venture, they are contingent upon the establishment of her fraud and misrepresentation claims. However, Dougherty's underlying claims cannot survive; thus, there are no underlying wrongful acts or unlawful purpose. Therefore, the civil conspiracy and joint venture claims should also be dismissed.

b)    **Unconscionability is a defense to an action for breach of contract, not an independent cause of action.**

Unconscionability is an equitable principle that arises as a response to the enforcement of a contract or contractual provision against a party; it is not a distinct cause of action. *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 752 (W. Va. 1986). Neither Dougherty nor

Defendants is seeking to enforce any contractual provisions by this contract. For this reason, Dougherty has no valid claim of unconscionabilty. Her claim, therefore, should be dismissed or stricken from the complaint.

## II.     VALIC is Entitled to Summary Judgment on Plaintiffs' Claims

### A.      Standard of Review.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a moving party has shown that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presents a genuine issue of material fact if a "reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the burden of proving that there are no facts from which a jury could draw inferences favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party makes this showing, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Id.* Summary judgment should only be granted in those cases where it is perfectly clear that there remains no genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trs. of Maryland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992). Here, if the Court is not inclined to grant dismissal on the pleadings, then summary judgment is appropriate, as the incontrovertible evidence demonstrates that Dougherty's claims accrued before April 2008.

### B.      The Summary Judgment Evidence Demonstrates that Dougherty Should have Discovered the Alleged Fraud at Least five years before the Filing of This Suit.

As stated above, a two year statute of limitations applies to Dougherty's fraud and misrepresentation claims, and the application of the discovery rule necessitates a showing of due

diligence.  W. VA. CODE § 55-2-12 (1959); *Univ. of W. Va. Bd. of Trs.,* 84 F. Supp. 2d at 768; *Gaither*, 487 S.E.2d at 903.  In this case, the evidence shows that her claim expired long before she filed suit.

First, the evidence shows that in 1992, Dougherty was given extensive materials about the DCP and was provided an explanation of how the plan worked in comparison to the TRS. (*See* RJN Exhs. #1a & #1b; Def. Appx. Exhs. #2 & #6, at P 00000023-29).  In particular, Dougherty was provided an illustration that explained all of the details of the plan and how to calculate projections. (*See* Def. Appx. Exh. #6).  Therefore, eighteen years ago, Dougherty was armed with all of the necessary information to determine whether any of the representations made, regarding the projections or any other aspect of the DCP, were in fact, false. (*See* RJN Exhs. #1a & #1b; Def. Appx. Exhs. #2 & #6).

Second, Dougherty transferred her Annuity DCP investment from the VALIC Annuity option in 1997. (*See* Def. Appx. Exh. # 7).  Again, Dougherty should have discovered any claims regarding her claim at the point of transfer.  While Dougherty alleges that she discovered Defendants' alleged fraud in 2008, she makes no allegation nor is there any evidence demonstrating that she was participating in the VALIC Annuity at that time.  Thus, any accrual of her claim should have occurred before or at the time she transferred from the Annuity in 1997, which was at least eleven years before this suit was filed.

Third, even if Dougherty's claim did not accrue in 1997, it must have accrued in 2002, at the latest, because at that time a number of newspaper articles reported the exact same concerns that Dougherty alleges here. (*See* RJN Exhs. ## 8-12).  Indeed, all of these articles detail that in 2002 a number of teachers complained that VALIC representatives had bullied them into switching retirement plans and how the DCP was performing and that the State had begun an

6389291

27

inquiry into these complaints. (*See id.*)  These articles, at a minimum, put Dougherty on inquiry notice of her claim.  Moreover, they demonstrate that her claims were susceptible of "discovery" long before 2008.  And if Dougherty had exercised a reasonable due diligence, she would have in fact discovered her claim.

In sum, this incontrovertible evidence dooms Dougherty's fraud and misrepresentation claims, as it shows that her claim accrued in August 2002, at the latest.  Accordingly, Dougherty should have filed this action by no later than August 2004, which she clearly did not do. Defendants, therefore, are entitled to summary judgment on their statute of limitations claim. *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (affirming dismissal because the "storm warnings" evident on the face of the detailed complaint and in a single magazine article created "a duty of inquiry," and the complaint was therefore time barred); *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1204 (10th Cir. 1998) (concluding that a published magazine article generally critical of a company's claims about its products was sufficient to put an investor on inquiry notice of his claims).

### Conclusion

Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, should be granted.

Respectfully Submitted,


/s/ Daniel McNeel Lane, Jr.
Daniel McNeel Lane, Jr.
(*admitted pro hac vice*)
Brian S. Jones
(*admitted pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
300 Convent Street, Suite 1600
San Antonio, Texas 78205
(210) 281-7000

-and-

Thomas J. Hurney, Jr., Esquire
WV Bar ID# 1833
Michael M. Fisher, Esquire
WV Bar ID# 4353
JACKSON KELLY PLLC
P.O. Box 553
Charleston, West Virginia 25322
(304) 340-1000

**Attorneys for Defendants Ramona Cerra, John
Cook, Greg Garrett, George Edwards, Clarence
Burdette, Roland Rich, Luther Cope, The
Variable Annuity Life Insurance Company, AIG
Retirement Advisors, Inc. (n/k/a VALIC
Financial Advisors, Inc.), and  AIG Retirement
Services Company (n/k/a VALIC Retirement
Services Company)**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all parties listed on this certificate of service will receive a copy of the foregoing document filed electronically with the United States District Court for the Southern District of West Virginia, on this <u>14th</u> day of August, 2009, with notice of case activity to be generated and ECF notice to be sent electronically by the Clerk of the Court. A copy will be mailed Via Certified Mail to those who do not receive ECF notice from the Clerk of the Court:

Harry F. Bell, Jr.
William Bands
Bell & Bands, PLLC
30 Capitol Street
P.O. Box 1723
Charleston, WV 25326-1723

Charles Webb
The Webb Law Firm
1081/2 Capitol Street, Suite 201
Charleston, WV 25301

Gary Pullin
Pullin Fowler Flanagan PLLC
901 Quarrier Street
Charleston, WV 25301

/s/ Daniel McNeel Lane, Jr.
DANIEL MCNEEL LANE, JR.

6389291